Opinion by Judge BEA; Dissent by Judge PREGERSON.
OPINION
BEA, Circuit Judge:
Where a large musical-instrument retailer pressures individual guitar manufacturers to set the lowest prices at which the manufacturers will permit any retailer to advertise the manufacturers’ products— and each manufacturer acquiesces — can we infer the manufacturers conspired among themselves to fix prices?
Plaintiffs ask us to answer this question in the affirmative. They claim it is plausible to infer a price-fixing conspiracy based only on allegations that certain guitar manufacturers each adopted similar advertising policies (“parallel conduct”) under circumstances that suggest the manufacturers agreed among themselves to adopt those policies (“plus factors”). But plaintiffs’ plus factors are no more consistent with an illegal agreement than with rational and competitive business strategies, independently adopted by firms acting within an interdependent market. Plaintiffs’ allegations of “merely parallel conduct that could just as well be independent action” are insufficient to state a claim under § 1 of the Sherman Act, 15 U.S.C. § 1. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 557, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). And because plaintiffs’ plus factors add nothing, we affirm the judgment of the district court dismissing plaintiffs’ § 1 claim.
I
Plaintiffs, a putative class, purchased guitars and guitar amplifiers from defendant Guitar Center, Inc. (“Guitar Center”), the largest retail seller of musical instruments in the United States.[1] The guitars and amplifiers were manufactured by five major manufacturers, defendants Fender Music Instruments Corp., Gibson Guitar Corp., Yamaha Corp. of America, Hoshino U.S.A., Inc., and Kaman Music Corp. (“manufacturer defendants”). In their present complaint, plaintiffs allege that between 2004 and 2009, Guitar Center and the manufacturer defendants — along with defendant trade association National Association of Music Merchants (NAMM)— conspired to implement and enforce minimum-advertised-price policies (“MAP policies”) that fixed the minimum price at which any retailer could advertise the manufacturers’ guitars and guitar amplifiers. According to plaintiffs, these MAP policies tended to raise retail prices and restrain competition. Plaintiffs allege that each manufacturer agreed with Guitar Center to adopt MAP policies and that the manufacturers agreed among themselves *1190 to adopt the MAP policies proposed by Guitar Center. Plaintiffs claim this collection of agreements violates § 1 of the Sherman Act and the antitrust laws of Massachusetts and California.

Prior Federal Trade Commission Investigation and Settlement

In 2007, before plaintiffs filed any of the cases that now constitute this consolidated litigation, the Federal Trade Commission (FTC) initiated a nonpublic investigation into price fixing in the'music-products industry. The FTC alleged that
[b]etween 2005 and 2007, NAMM organized various meetings and programs at which competing retailers of musical instruments were permitted and encouraged to discuss strategies for implementing minimum advertised price policies, the restriction of retail price competition, and the need for higher retail prices.... At these NAMM-sponsored events, competitors discussed the adoption, implementation, and enforcement of minimum advertised price policies; the details and workings of such policies; appropriate and optimal retail prices and margins; and other competitively sensitive issues.
Complaint, In re National Association of Music Merchants, Inc., No. C-4255, at ¶ 5. The FTC further alleged that the exchange of information among NAMM members (which include Guitar Center and the manufacturer defendants) “served no legitimate business purpose” and “had the purpose, tendency, and capacity to facilitate collusion and to restrain competition unreasonably.” Id. at ¶¶ 6-7. Neither Guitar Center nor the manufacturer defendants were parties to this FTC proceeding.
The FTC and NAMM resolved the dispute through a consent decree. In the consent decree, the FTC ordered NAMM to cease and desist from “urging, encouraging, advocating, suggesting, coordinating, participating in, or facilitating in any manner the exchange of information between or among Musical Product Manufacturers or Musical Product Dealers relating to ... Price Terms, margins, profits, or pricing policies, including but not limited to Minimum Advertised Price Policies.” Decision and Order, In re National Association of Music Merchants, Inc., No. C-4255, at *4. NAMM must also file periodic compliance reports and make a statement before each NAMM trade show informing members of the organization’s and members’ obligations under the antitrust laws. Id. at *5-7. NAMM neither admitted nor denied the FTC’s allegations, and the FTC did not levy any monetary fine.

Proceedings Below

After the FTC issued its consent decree, numerous plaintiffs filed complaints alleging that defendants agreed to fix the retail prices of musical instruments in violation of § 1 of the Sherman Act and state antitrust laws. The Judicial Panel on Multidistrict Litigation centralized twenty-eight of these cases in the Southern District of California.
Defendants moved to dismiss plaintiffs’ first consolidated class-action complaint under Federal Rule of Civil Procedure 12(b)(6). Defendants argued that plaintiffs’ allegations were insufficiently detailed to satisfy the requirements of specificity and plausibility that the Supreme Court had recently outlined in Twombly. The district court granted the motion to dismiss in part but permitted plaintiffs to amend their complaint. The district court found that plaintiffs failed to identify in their complaint “who is alleged to have conspired with whom, what exactly they agreed to, and how the alleged conspiracy was organized and carried out.” Nor did plaintiffs “plead enough of the [MAP policies’] terms to show how they restrained competition.” The district court gave plaintiffs a chance to remedy these problems by permitting some discovery. But *1191 because the district court agreed with defendants that “remarks at open panel discussions attended by many people at trade shows cannot reasonably constitute the terms of an illegal agreement in these circumstances,” the court “limited [discovery] to who attended or participated in meetings alleged in the amended consolidated complaint and what was said or agreed to there.”[2]
Following this limited discovery, plaintiffs filed the operative complaint. Defendants again moved to dismiss the complaint for its failure to state a claim. The district court granted defendants’ motion and dismissed plaintiffs’ § 1 claim with prejudice for failure to satisfy the pleading standard set forth in Twombly. Plaintiffs timely appealed.
II
We exercise appellate jurisdiction under 28 U.S.C. § 1291. We review de novo the district court’s dismissal of a complaint for failure to state a claim. See Ecological Rights Found. v. Pac. Gas & Elec. Co., 713 F.3d 502, 507 (9th Cir.2013). When conducting this review, we accept as true all nonconclusory factual allegations in the complaint. Id. (citing Rowe v. Educ. Credit Mgmt. Corp., 559 F.3d 1028, 1029-30 (9th Cir.2009)).
III
A
The antitrust laws of the United States aim to protect consumers by maintaining competitive markets. To that end, § 1 of the Sherman Act prohibits agreements that unreasonably restrain trade by restricting production, raising prices, or otherwise manipulating markets to the detriment of consumers. See 15 U.S.C. § 1; State Oil Co. v. Khan, 522 U.S. 3, 10, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997); Apex Hosiery Co. v. Leader, 310 U.S. 469, 493, 60 S.Ct. 982, 84 L.Ed. 1311 (1940).
In analyzing the reasonableness of an agreement under § 1, the Supreme Court has distinguished between agreements made up and down a supply chain, such as between a manufacturer and a retailer (“vertical agreements”), and agreements made among competitors (“horizontal agreements”). The Supreine Court has recognized that certain horizontal agreements “always or almost always tend to restrict competition and decrease output.” Broadcast Music, Inc. v. CBS, 441 U.S. 1, 19-20, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979). Classic examples include agreements among competitors to fix prices, divide markets, and refuse to deal. See, e.g., United States v. Trenton Potteries Co., 273 U.S. 392, 397-98, 47 S.Ct. 377, 71 L.Ed. 700 (1927) (horizontal price fixing); United States v. Topco Assocs., 405 U.S. 596, 608, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972) (horizontal market division); Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co., 472 U.S. 284, 293-94, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985) (concerted refusal to deal). Such inherently anti-competitive horizontal agreements violate the Sherman Act per se. Once the agreement’s existence is established, no further inquiry into the practice’s actual effect on the market or the parties’ intentions is necessary to establish a § 1 violation. See N. Pac. Ry. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). Vertical agreements, on the other hand, are analyzed under the rule of reason, whereby courts examine “the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed,” to determine the effect on competition in the *1192 relevant product market. Nat’l Soc’y of Professional Eng’rs v. United States, 435 U.S. 679, 692, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978). That analysis takes into account the fact that some vertical restraints may have procompetitive justifications that benefit consumers. See Leegin Creative Leather Prods. v. PSKS, Inc., 551 U.S. 877, 889-92, 127 S.Ct. 2705, 168 L.Ed.2d 623 (2007) (noting that vertical price restraints can have the procompetitive effect of increasing interbrand competition).
But the line between horizontal and vertical restraints can blur. One conspiracy can involve both direct competitors and actors up and down the supply chain, and hence consist of both horizontal and vertical agreements. Plaintiffs here allege one such hybrid form of conspiracy, sometimes called a “hub-and-spoke” conspiracy. Although other circuits have recognized the existence of “hub-and-spoke” conspiracies in the antitrust context, see, e.g., Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc., 602 F.3d 237, 255 (3d Cir.2010) (explaining the configuration of a hub-and-spoke conspiracy); Toys ‘R’ Us, Inc. v. FTC, 221 F.3d 928, 934 (7th Cir.2000) (describing a hub-and-spoke conspiracy without calling it such), we have not. We write to clarify the analysis of such conspiracies under § 1.
A traditional hub-and-spoke conspiracy has three elements: (1) a hub, such as a dominant purchaser; (2) spokes, such as competing manufacturers or distributors that enter into vertical agreements with the hub; and (3) the rim of the wheel, which consists of horizontal agreements among the spokes. See Howard Hess, 602 F.3d at 255. According to plaintiffs, Guitar Center (the hub) pressured each of the manufacturer defendants (the spokes) to adopt MAP policies, and the manufacturer defendants, in turn, each agreed among themselves to adopt the policies (the rim). NAMM acted to facilitate these illegal agreements by encouraging adoption of MAP policies — a role that may be illegal but lacks an obvious wheel analogue (might we suggest “lug nuts”?).
Of course, homespun metaphors for complex economic activities go only so far. Section 1 prohibits agreements that unreasonably restrain trade, no matter the configuration they take or the labels we give them. A hub-and-spoke conspiracy is simply a collection of vertical and horizontal agreements. And once the conspiracy is broken into its constituent parts, the respective vertical and horizontal agreements can be analyzed either under the rule of reason or as violations per se.[3] See Toys R’ Us, 221 F.3d at 933, 940 (endor *1193 ing the FTC’s analysis of the vertical components of a hub-and-spoke conspiracy under the rule of reason while treating the horizontal agreements as violations per se).
Here, the key agreements are those among the defendant manufacturers. Plaintiffs made it clear both before the district court and on appeal that their theory of the case depends on estabhshing those horizontal agreements.[4] The question before us is whether plaintiffs have pleaded sufficient facts to provide a plausible basis from which we can infer the alleged agreements’ existence. See Twombly, 550 U.S. at 556-57, 560, 127 S.Ct. 1955.
B
Because plaintiffs lack direct evidence of horizontal agreements among the manufacturers,[5] they plead that the defendant manufacturers’ parallel conduct in adopting MAP policies, in conjunction -with several “plus factors,” plausibly suggests the existence of horizontal agreements. They argue that the plus factors “nudge[ ]” their allegations of horizontal agreements “across the line from conceivable to plausible.” Id. at 570,127 S.Ct. 1955.
Under Twombly, parallel conduct, such as competitors adopting similar policies around the same time in response to similar market conditions, may constitute circumstantial evidence of anticompetitive behavior. 550 U.S. at 553-54, 127 S.Ct. 1955. But mere allegations of parallel conduct — even consciously parallel conduct— are insufficient to state a claim under § 1. Plaintiffs must plead “something more,” “some further factual enhancement,” a “further circumstance pointing toward a meeting of the minds” of the alleged conspirators. Id. at 557, 560, 127 S.Ct. 1955.
In this way, Twombly takes into account the economic reality that mere parallel conduct is as consistent with agreement among competitors as it is with independent conduct in an interdependent market. See id. at 554, 127 S.Ct. 1955 (“The inadequacy of showing parallel conduct or interdependence, without more, mirrors the ambiguity of the behavior: consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market.”). In an interdependent market, companies base their actions in part on the anticipated reactions of their competitors. And because of this mutual awareness, two firms may arrive at identical decisions independently, as they are cognizant of — and reacting to — similar market pressures. In other words, competitors’ behavior may be consciously parallel. Recognizing that parallel conduct may arise on account of independent business decisions rather than an illegal agreement, Twombly requires that when allegations of parallel conduct are set out to *1194 make a § 1 claim, plaintiffs' must plead enough nonconclusory facts to place that parallel conduct “in a context that raises a suggestion of a preceding agreement.” Id. at 557, 127 S.Ct. 1955. “Allegations of facts that could just as easily suggest rational, legal business behavior by the defendants as they could suggest an illegal conspiracy” are insufficient to plead a § 1 violation. Kendall v. Visa U.S.A., Inc., 518 F.3d 1042, 1049 (9th Cir.2008) (citing Twombly, 550 U.S. at 553-58 & n. 5, 127 S.Ct. 1955); see also Ashcroft v. Iqbal, 556 U.S. 662, 668, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (“Where a complaint pleads facts that are merely consistent with a defendant’s liability, it stops short of the line between possibility and plausibility of entitlement to relief.” (quoting Twombly, 550 U.S. at 557, 127 S.Ct. 1955) (internal quotation marks omitted)).[6]
This court has distinguished permissible parallel conduct from impermissible conspiracy by looking for certain “plus factors.” See, e.g., In re Citric Acid Litig., 191 F.3d 1090, 1102 (9th Cir.1999) (“Parallel pricing is a relevant factor to be considered along with the evidence as a whole; if there are sufficient other ‘plus’ factors, an inference of conspiracy can be reasonable.”). Whereas parallel conduct is as consistent with independent action as with conspiracy, plus factors are economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action. See Twombly, 550 U.S. at 557 n. 4, 127 S.Ct. 1955. If pleaded,- they can place parallel conduct “in a context that raises a suggestion of preceding agreement.” Id. at 557, 127 S.Ct. 1955; cf. In re Citric Acid Litig., 191 F.3d at 1102.[7]
Plaintiffs in their briefs and at oral argument identified the following six plus factors alleged in the operative complaint: (1) defendants shared a common motive to conspire; (2) the manufacturer defendants acted against their sélf-interest; (3) the manufacturer defendants simultaneously adopted substantially similar MAP policies; (4) the FTC’s investigation and consent decree; (5) the defendants’ participation in NAMM; and (6) retail prices for guitars and guitar amplifiers rose during the class period as the number of units sold fell.
We consider each purported plus factor in turn and cumulatively to determine whether plaintiffs have alleged nonconclusory facts sufficient to state a claim under § 1.

Common Motive

Plaintiffs allege that the manufacturer defendants shared a similar motive to collude. But common motive does not suggest an agreement. Any firm that believes that it could increase profits by raising prices has a motive to reach an advance agreement with its competitors.[8] *1195 Thus, alleging “common motive to conspire” simply restates that a market is interdependent (i.e., that the profitability of a firm’s decisions regarding pricing depends on competitors’ reactions). Interdependence, however, does not entail collusion, as interdependent firms may engage in consciously parallel conduct through observation of their competitors’ decisions, even absent an agreement. And allegations of parallel conduct — though recast as common motive — is insufficient to plead a § 1 violation. See Twombly, 550 U.S. at 556-57, 127 S.Ct. 1955.

Action Against Self-Interest

Plaintiffs allege that defendant manufacturers acted against self-interest by adopting MAP policies with Guitar Center. Again, plaintiffs fail to account for conscious parallelism and the pressures of an interdependent market. An action that would seem against self-interest in a competitive market may just as well reflect market interdependence giving rise to conscious parallelism. For example, each firm in an interdependent market expects that a widely unfollowed price increase will be rescinded. But so long as prices can be easily readjusted without persistent negative consequences, one firm can risk being the first to raise prices, confident that if its price is followed, all firms will benefit. By that process (“follow the leader”), supra-competitive prices and other .anticompetitive practices, once initiated, can spread through a market without any prior agreement.
More extreme action against self-interest, however, may suggest prior agreement — for example, where individual action would be so perilous in the absence of advance agreement that no reasonable firm would make the challenged move without such an agreement. Here, if no reasonable manufacturer would have entered into a MAP policy without assurances that all other manufacturers would enter into similar agreements, that would suggest collusion. But the complaint itself, perhaps maladroitly, provides ample independent business reasons why each of the manufacturers adopted and enforced MAP policies even absent an agreement among the defendant manufacturers. Plaintiffs allege that each manufacturer was “pressured by Guitar Center” to adopt MAP policies that were advantageous to Guitar Center, and the complaint concedes that each manufacturer “responded to Guitar Center’s pressure and coercion” by adopting MAP policies “in exchange for Guitar Center’s agreement to purchase large volumes of the manufacturer’s product stock.” Manufacturers’ decisions to heed similar demands made by a common, important customer do not suggest conspiracy or collusion. They support a different conclusion: self-interested independent parallel conduct in an interdependent market. See id.

Simultaneous Adoption of MAP Policies

Plaintiffs allege that the manufacturer defendants simultaneously implemented and enforced MAP policies with similar terms. Cf. id. at 557 n. 4, 127 S.Ct. 1955 (“[C]omplex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors and made for no other discernible reason would support a plausible inference of conspiracy.”). But according to the *1196 complaint, the manufacturer defendants adopted the policies over a period of several years, not simultaneously. Allegations of such slow adoption of similar policies does not raise the specter of collusion. Cf. In re Text Messaging Antitrust Litig., 630 F.3d 622, 628 (7th Cir.2010) (finding persuasive plaintiffs’ allegation of parallel conduct “all at once”).
Even assuming that the progressive adoption of similar policies across an industry constitutes simultaneity, that fact does not reveal anything more than similar reaction to similar pressures within an interdependent market, or conscious parallelism. All of the manufacturer defendants were dealing with the same important customer, Guitar Center, which ostensibly exercised its considerable market power to demand similar terms from each manufacturer for its own benefit.[9] The manufacturers’ similar response to this market pressure is a hallmark of independent parallel conduct — not collusion.

The FTC’s Investigation of NAMM

Plaintiffs argue that the FTC’s investigation of NAMM suggests an agreement was made. The FTC alleged violations of § 5 of the Federal Trade Commission Act (FTC Act), 15 U.S.C. § 45, which prohibits “unfair methods of competition.” But unlike § 1 of the Sherman Act, a violation of § 5 of the FTC Act does not require allegation and proof of a contract, combination, or conspiracy. An organization may violate § 5 of the FTC Act without violating § 1 of the Sherman Act. See FTC v. Sperry & Hutchinson Co., 405 U.S. 233, 239-44, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972).[10] And neither the FTC complaint nor the consent decree alleged that any company or group actually conspired or agreed to adopt MAP policies, nor do they suggest such an agreement was made.

Defendants’ Attendance of NAMM Meetings

Plaintiffs allege that Guitar Center advocated for the concerted adoption of anti-competitive MAP policies at NAMM meetings. But mere participation in trade-organization meetings where information is exchanged and strategies are advocated does not suggest an illegal agreement. As we recognized in In re Citric Acid Litigation:
Gathering information about pricing and competition in the industry is standard fare for trade associations. If we allowed conspiracy to be inferred from such activities alone, we would have to allow an inference of conspiracy whenever a trade association took almost any action. As the Supreme Court has recognized, however, trade associations often serve legitimate functions, such as providing information to industry members, conducting research to further the goals of the industry, and promoting demand for products and services.
191 F.3d at 1098.[11]
*1197 Moreover, plaintiffs allege that the industry had encouraged the adoption of MAP policies as in each manufacturer’s self-interest for years before the class period. Such an allegation does not suggest agreement; it provides a context for “merely parallel conduct that could just as well be independent action.” Twombly, 550 U.S. at 557,127 S.Ct. 1955.

Rising Pnces

Plaintiffs allege that the average retail price of guitars and guitar amplifiers rose during the class period as the total number of units sold fell. The dissent asserts that these “allegations that prices rose despite falling.demand” are “perhaps most suggestive of collusion.” Dissent at 1199-1200. We are not convinced.
First, plaintiffs do not allege that the average retail price of guitars and amplifiers manufactured by defendants rose during the class period. They allege an increase in the average retail price of all guitars and guitar amplifiers sold, including products outside the relevant product market, like low-cost imports. The same can be said of the alleged drop in sales.[12] But even if plaintiffs had alleged that retail prices of defendants’ guitars and amplifiers rose in tandem as sales dropped, such a price increase is no more suggestive of collusion than it is of any other potential cause.[13] Plaintiffs do not allege any facts connecting the purported price increase to an illegal agreement among competitors. And without such a connection, there is simply no basis from which we can infer an agreement. In this regard, parallel price increases, without more, are no different from other forms of parallel conduct. They are “merely consistent with a defendant’s liability” but “stop[] short of the line between possibility and plausibility of entitlement to relief.” Iqbal, 556 U.S. at 668, 129 S.Ct. 1937 (quoting Twombly, 550 U.S. at 557, 127 S.Ct. 1955) (internal quotation marks omitted).[14]
*1198 The dissent urges that, “when analyzed together,” plaintiffs’ purported plus factors provide a context that plausibly suggests that “an illicit horizontal agreement was made between the manufacturer defendants.” Dissent at 1200. We disagree. Plaintiffs have indeed provided a context for the manufacturers’ adoption of MAP policies, but not one that plausibly suggests they entered into illegal horizontal agreements. Instead, the complaint tells a different story, one in which Guitar Center used its substantial market power to pressure each manufacturer to adopt similar policies, and each manufacturer adopted those policies as in its own interest. Such conduct may be anticompetitive — and perhaps even violate the antitrust laws — -but it does not suggest the manufacturers illegally agreed among themselves to restrain competition.
IV
Plaintiffs have failed to allege enough nonconclusory facts to support the plausible inference that any agreement among the manufacturers was made. For that reason, their § 1 claim must be dismissed.
AFFIRMED.

. Plaintiffs allege that Guitar Center exercises considerable market power in the musical-instruments industry — especially the market for guitars and guitar amplifiers — controlling nearly one third of all retail sales in the United States; Guitar Center also serves as the largest retailer-customer of many of its instrument manufacturers.

. Discovery consisted of document requests and interrogatories served on each defendant; plaintiffs also deposed NAMM’s CEO and seven employees or former employees of the manufacturer defendants and Guitar Center.

. Some courts have distinguished between "rimmed” and "rimless” hub-and-spoke conspiracies. See, e.g., Dickson v. Microsoft Corp., 309 F.3d 193, 203-04 & n. 13 (4th Cir.2002). In Dickson, the Fourth Circuit characterized a rimless hub-and-spoke conspiracy as one in which "various defendants enter into separate agreements with a common defendant, but where the defendants have no connection with one another other than the common defendant’s involvement in each transaction.” Id. at 203. The extension of the wheel metaphor here may mislead: a rimless hub-and-spoke conspiracy is not a hub-and-spoke conspiracy at all (for what is a wheel without a rim?); it is a collection of purely vertical agreements. But such a conspiracy may yet unreasonably restrain trade. see, e.g., Leegin, 551 U.S. at 898-99, 127 S.Ct. 2705 (recognizing that purely vertical restraints may unreasonably restrain trade in violation of § 1).
We note, however, one key difference between a rimless hub-and-spoke conspiracy {i.e., a collection of purely vertical agreements) and a rimmed hub-and-spoke conspiracy {i.e., a collection of vertical agreements joined by horizontal agreements): courts analyze vertical agreements under the rule of reason, see id., whereas horizontal agreements are violations per se, see United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 223-24, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). This distinction provides strong incentives for plaintiffs to plead a horizontal conspiracy (ei *1193 ther alone or as part of a rimmed hub-and-spoke conspiracy). The prospect of establishing a violation per se is much more appealing to plaintiffs than the potential difficulty and costliness of proving a § 1 claim under the rule of reason.

. Plaintiffs stated at oral argument that they did not claim the vertical agreements between the manufacturers and Guitar Center to adopt MAP policies to be unreasonable vertical restraints under § 1, nor do they challenge the MAP policies themselves. Plaintiffs’ other allegations (e.g., that Guitar Center and NAMM conspired to facilitate and keep in place the agreements among the manufacturers) are predicated on the existence of the horizontal agreements among the manufacturers.

. Even after the limited discovery permitted by the district court, plaintiffs still do not plead facts in answer to the district court's questions: "who is alleged to have conspired with whom, what exactly they agreed to, and how the alleged conspiracy was organized and carried out.”

. The requirement that plaintiffs allege nonconclusory facts means that plaintiffs cannot plead merely parallel conduct and allege conspiracy. Conspiracy is a legal conclusion. See Kendall, 518 F.3d at 1047. Rather, plaintiffs must plead evidentiary facts: "who, did what, to whom (or with whom), where, and when.” Id. at 1048.

. In In re Citric Acid Litigation, we recognized that circumstantial evidence in the form of plus factors could support the reasonable inference of an agreement and thus raise a genuine issue of material fact to defeat a defendant’s motion for summary judgment. 191 F.3d at 1102, 1108 (affirming the district court's grant of defendant’s motion for summary judgment, in part because of a lack of plus factors). The same principle obtains in the context of a motion to dismiss. Plus factors coupled with parallel conduct can take a complaint from merely possible to plausible.

.We note that there are (at least) two ways for firms to increase profit. They can compete to capture greater market share, carving out a bigger piece of the existing pie. Or they can keep their market share the same while *1195 increasing prices. If all firms increase prices, they have managed to grow the pie, though their individual slices remain proportionally the same. In a competitive market, attempts to grow the pie by charging supracompetitive prices will be tempered by price competition as individual firms attempt to capture greater market share. But common motive for increased profits always exists.

. The operative complaint does not allege Guitar Center violated § 2 of the Sherman Act (or any provisions of the Federal Trade Commission Act) in any attempted monopolization of the retail guitar and amplifier market; nor do plaintiffs allege that the MAP policies themselves are illegal vertical agreements in restraint of trade under § 1.

. The cases plaintiffs cite as supporting their assertion that government investigations "bolster the plausibility analysis," all involved ongoing criminal investigations into alleged conspiratorial price fixing under § 1 of the Sherman Act. See, e.g., In re Packaged Ice Antitrust Litig., 723 F.Supp.2d 987, 1009 (E.D.Mich.2010). Those cases are inapposite here, where the FTC complaint was based on § 5 of the FTC Act, 15 U.S.C. § 45, which does not require allegation of an agreement or conspiracy.

.In this our law differs from the suspicions of Adam Smith, written at a time before the *1197 enactment of the Sherman Act: “People of the same trade seldom meet together, even for merriment and diversion, but the conversation ends in a conspiracy against the public, or in some contrivance to raise prices.” Adam Smith, An Inquiry into the Nature and Causes of the Wealth of Nations, vol. 1, bk. 1, ch. 10 (1776).

. Plaintiffs admitted in their initial complaint that the data recited by the dissent is— to put it mildly — "over-inclusive.” Whereas the complaint defines the relevant product market as the market for “High-end Guitars and Guitar Amplifiers,” plaintiffs’ data "include[ ] products outside of the relevant product market(s), such as low-cost imports.” As far as we can tell from the complaint, retail prices of defendants’ products actually might have fallen during the class period as the average retail price for all guitars and guitar amplifiers rose. Plaintiffs make no allegation either way.

. Plaintiffs make no allegation as to the cause of the increase in price or the decrease in units sold, aside from noting the data recited are "[cjonsistent with the formation of the alleged conspiracy.” But allegations that are merely consistent with conspiracy are not enough. See Twombly, 550 U.S. at 557, 127 S.Ct. 1955. Any manner of economic variables may have contributed to these fluctuations in prices and sales, from external market pressures to permissible conscious parallelism. For example, if the cost of materials or labor rose, prices could rise irrespective of a decrease in units sold. Indeed, in such a scenario, we would expect a price hike to be accompanied by a drop in sales.

.We find plaintiffs’ allegations here to be readily distinguishable from those considered by the Seventh Circuit in In re Text Messaging Antitrust Litigation. There, the four defendants operated in an extremely concentrated market, in which they controlled 90% of text-messaging services in the United States. 630 F.3d at 628. Plaintiffs in that case alleged not merely that prices had risen; they alleged that "all at once the defendants changed their pricing structures, which were heterogeneous and complex, to a uniform pricing structure, and then simultaneously jacked up their . prices by a third.” Id. Such uniformity and simultaneity are lacking here. Plaintiffs do not allege that defendants’ prices rose (in *1198 concert or otherwise); they allege the average price of all guitars and guitar amplifiers rose. And plaintiffs do not allege these changes occurred “all at once”; they allege defendants adopted MAP policies over the course of three years.